# EXHIBIT "I"
# Dudley Report

JOSEPH P. CUVIELLO and DENIZ BOLBOL

INDIVIDUALLY, PLAINTIFFS,

v.

ROWELL RANCH RODEO, INC.;

HAYWARD AREA RECREATION AND PARK DISTRICT;

HAYWARD AREA RECREATION AND PARK DISTRICT PUBLIC
SAFETY MANAGER/RANGER

KEVIN HART;

ALAMEDA COUNTY;

ALAMEDA COUNTY DEPUTY SHERIFF JOSHUA MAYFIELD;

and DOES 1 and 2, in their individual and official capacities, jointly and
severally,

DEFENDANTS.


IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


Case No: 3:23-cv-01652-VC



RULE 26(a)(2)(B) REPORT of James I. Dudley

April 19, 2024

May 23, 2024

May 24, 2024

Mr. Dale Allen Attorney at Law

Allen Glaessner Hazelwood Werth

180 Montgomery St., Suite 1200

San Francisco, CA. 94104


Mr. William B. Rowell

Fennemore Wendel

1111 Broadway, 24th Floor

Oakland, CA 94607


Re: JOSEPH P. CUVIELLO and DENIZ BOLBOL INDIVIDUALLY, PLAINTIFFS,
v.
ROWELL RANCH RODEO, INC.; HAYWARD AREA RECREATION AND PARK DISTRICT;
HAYWARD AREA RECREATION AND PARK DISTRICT PUBLIC SAFETY MANAGER/RANGER
KEVIN HART; ALAMEDA COUNTY; ALAMEDA COUNTY DEPUTY SHERIFF JOSHUA
MAYFIELD; and DOES 1 and 2.
Case No. 3:23-cv-01652-VC


Dear Messrs. Allen and Rowell,

 In accordance with the Federal Rules of Civil Procedure 26(a)(2)(B) [Attachment A], the
following updated report presents my opinions in the above-cited case. If additional discovery or
other materials are made available to me for further review and analysis, and I will provide a
further supplement to this report as necessary.

Should Plaintiffs present any expert opinion on these topics, and to the extent they do, I reserve
the right to review, respond to, and, as appropriate, rebut those opinions.

Sincerely,


James I. Dudley

JD Consulting

718 Crompton Road

Redwood City, CA. 94061

Table of Contents

**1.** Introduction …………………………………………………………………………...4

**2.** Methodology and Facts or Data Considered …………………………………………… 5-6

**3.** Incident Summary……………………………………………………………………......6-9

**4.** Expert Opinions: Analysis, Basis and Reason……………………………….......... 10-16

Opinion One ……………………………………………………………………… 12

Opinion Two …………………………………………………………………….… 13

Opinion Three …………………………………………………………………...……13

Opinion Four ……………………………………………………………….......... 14

Opinion Five …………………………………………………………………15-16


Attachment A ……………………………………………………………...……17

Federal Rules of Civil Procedure 26(a) (2) (B) 3 4 (B)…………………………………… 17


Attachment B …………………………………………………………………....…18

Federal Rules of Evidence 702 ……………………………………………………...……18


Attachment C ……………………………………………………………………19-25

Materials Reviewed, Facts or Data Considered, and Exhibits Federal Rules of Civil Procedure 26(a) (2) (B) (ii); 26(a) (2) (B) (iii) ……………………………………………………19-25


Attachment D ………………………………………………………………………26-28

Qualifications Federal Rules of Civil Procedure 26(a)(2)(B)(iv) ………………………… 26-28


Attachment E ……………………………………………………………………… 29-31

Ten-Year Publication History 3 Federal Rules of Civil Procedure 26(a)(2)(B)(iv)……….…29-31


Attachment F ……………………………………………………………………....  32

Four-Year Testimony History Federal Rules of Civil Procedure 26(a)(2)(B)(v) ……………… 32


Attachment G ……………………………………………………………….…….. 33

Compensation for Study and Testimony in the Case Federal Rules of Civil Procedure 26(a)(2)(B)(vi) ……………………………………………………………………… 33

# 1 Introduction

My name is James I. Dudley, and I have been retained by counsel for Defendants HAYWARD AREA RECREATION AND PARK DISTRICT ("HARD"); HARD PUBLIC SAFETY MANAGER/RANGER KEVIN HART ("HART"); ALAMEDA COUNTY SHERIFF'S OFFICE ("COUNTY"); and ALAMEDA COUNTY DEPUTY SHERIFF JOSHUA MAYFIELD ("MAYFIELD") to review the material and information provided in this case and offer objective opinions concerning the actions of HARD, HART, COUNTY and MAYFIELD in regards to the interactions with Plaintiffs Joseph P. Cuviello and Deniz Bolbol ("Plaintiffs") on May 20, 2022 at the Rowell Ranch Rodeo, in Alameda County, California, beginning at approximately 17:30 pm. Case No. 3:23-cv-01652-VC.

My opinions and the basis and reasons for them are included in the body of the report that follows.

The documents, materials, facts, or data I considered to form my opinions, can be found in Attachment "C" and throughout the body of the report, including but not limited to, any in-text references or footnotes.

My qualifications as a Police Practices Expert are included in Attachment "D." A list of my publications authored in the previous ten years is included in Attachment "E." A list of other cases in which I have testified at trial or by deposition during the previous four years is included in Attachment "F." A statement of compensation to be paid for study and testimony this case is included in Attachment "G."

**Scope of this review**

My review is to determine if:

 1. COUNTY provided a 'Duty of Care' fitting to the situation during the present at the Rowell Ranch Rodeo on 5/20/2022.

2. The protester/demonstrators at the Rowell Ranch Rodeo Event on May 20, 2022 were given reasonable access at the event;

3. Whether the time, place and manner of access were denied due to the content of the protest;

4. Whether instructions given to the protesters were reasonable and in compliance with industry standards;

5. Whether the protesters were threatened with arrest at the event on 05/20/2022.

## 2 Methodology Used, and Facts or Data Considered

For purposes of this review "protest" and "demonstration" are used to describe the actions taken by individuals who were in disagreement with the rodeo activities and convey the message through actions, leaflets, signs, banners, voice messages, physical positioning and other means.

The First Amendment states: *Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.*

Time, place and manner restrictions are content-neutral limitations imposed by the government on expressive activity. In this case, there were no attempts made to restrict or dissuade the protesters at Rowell Ranch, based on the content, but in relation to their positions on pathways, roadways and in impeding free movement by the patrons attempting to enter the rodeo.

When forming my opinions, I keep in mind that the role of an expert is to provide specialized knowledge that is both relevant and reliable to assist the trier of fact in understanding the evidence or determining a fact in an issue.

In my roles as a police officer, Sergeant, Lieutenant, Captain, Commander and Deputy Chief, I had occasions to train for Crowd Control, Protests, Demonstrations and Managing Events, including planned and spontaneous events, natural and man-made disasters and critical incidents. Training included California POST Training in Crowd Control, First Amendment Activities, the Incident Command System (ICS), planning and management.  FEMA training included sections on Planning for Events.   In this case, my focus was directed to the facts and circumstances surrounding the contact between representatives of the Rowell Ranch Rodeo, HARD; HART; COUNTY; and MAYFIELD and Plaintiffs.

In this case, I began by reviewing the facts and data described in the primary source documents and materials specific to this case, as listed in Attachment "C." Then, using my knowledge, education, training, and experience, I analyzed the facts and data aggregated from those materials while examining and accounting for obvious alternate explanations for the actions and responses of the parties involved. I then compared the facts gathered from those materials against secondary sources representing generally accepted law enforcement training, practices, procedures, and specific Hayward Area Recreation and Park District and the Alameda County Sheriff's policy. Where practicable, peer-reviewed literature and other publications have been used as secondary sources. Such materials are the type upon which others in the law enforcement profession and I rely when examining the events surrounding a police response and forming opinions regarding the matters addressed herein. Additionally, my opinions are informed by the totality of the materials I have read and studied and the experiences and instruction I have had and provided to law enforcement throughout my 32-year career.

To stay current in the field of law enforcement and associated training, practices, and procedures, I maintain memberships in the International Law Enforcement Educators and Trainers Association (ILEETA), the International Association of Chiefs of Police (IACP), the Police Executive Research Forum (PERF), the FBI National Academy Associates (FBINAA) and other professional organizations.

I research and study law enforcement methods, practices, and tactical issues by regularly accessing academic research, training materials, and news reports as part of my preparation for teaching Criminal Justice classes at San Francisco State University. I often review new publications regarding law enforcement practices. I frequently engage in discussions and debriefings with officers, law enforcement trainers, managers, and executives about law enforcement policy, procedure, practices, and tactics as part of my research for classes and articles that I have written for a law enforcement publication, Police One.com.  I also research current practices and issues in preparation for interviews for a podcast that I host called "Policing Matters."

Law enforcement officers are expected to have a working knowledge of the legal issues impacting their profession. During my training and consultations with officers in both formal and informal settings, I often discuss legal matters and case decisions that affect how they perform their jobs. As such, in this report and corresponding testimony, I may refer to established law, concepts, principles, and case citations pertinent to the facts of this case. I do so only to assist the trier of fact in understanding the body of knowledge expected of an objectively reasonable officer and the reasoning and methods informing my opinions.

This report contains the opinions I have formed and the reasoning supporting those opinions based on the facts and evidence currently available. This is a preliminary report, as I understand discovery in this case continues. I may be provided additional information and documents, including expert reports from Plaintiffs and the other defendants in this matter. Upon review of further documents, if counsel or the Court requests, I may consider new information and, as appropriate, supplement my report, including the opinions expressed therein. In particular, I understand that Plaintiffs have not yet disclosed whether they intend to present any expert opinion on these topics. To the extent they do, I reserve the right to review, respond to, and, as appropriate, rebut those opinions.

## 3 Incident Summary

### Alameda County Sheriff Office's Preparation for the Event on 05/20/2022

Three weeks prior to the event, and after the grounds were secured with the permit to hold the rodeo, the Alameda County Sheriff's Office ("ACSO") made preparations for a general presence at the event.

In a memorandum email from ACSO Division Commander Colby Staysa, dated 05/09/2024, the commander addressed several dozens of members seeking "four volunteers to work the Rowell Ranch Rodeo on Friday 05/20/2024 from 1730-midnight"

Deputies Joshua Mayfield, Christian Campbell, Sowmya Ramadas and Matthew Laszuk volunteered, per a memo from Commander Staysa- indicating Deputy Mayfield as Lead on the assignment.  A memo from Deputy Mayfield includes details about the event, including a time to be ready at 1730 [5:30 PM] and instructions to "make sure your uniform is clean and presentable and be ready to smile and interact with the community." He includes that "this should be a fun event and we are there mainly as a law enforcement presence…."

(Correspondence emails labeled AlamedaCounty_Bolbol_000280-289)

**Timeline of events for 05/20/2022 - "Fennemore Memorandum" (A full Timeline is attached in Attachment A)**

(From ACSO's videos and dispatch records & plaintiffs' videos)

1. Sometime **after 5:30 pm,** protesters opposing the rodeo, later identified as <u>Pat Cuviello and Deniz Bolbol,</u> arrive on foot through the parking lot gate. (Plaintiffs' Video 16 – Clip 1.)

2. **At approx. 17:45-17:50, [5:45-5:50 pm]**, Rowell Ranch <u>Representative Gary Houts</u> approaches Cuviello & Bolbol and advises them to go to the designated free speech area, but they refuse. Cuviello says, "Call the police-call the police."- Bolbol says, "You'll learn a lot about the First Amendment- it'll be a fun experience…"  (Plaintiffs' Video 14- Video 2).

3. **At 17:51,** Houts calls 911 Dispatch (Event Register doc.) Call recorded as "Disturb Peace"- dispatched at 17:51:24 [5:51 pm].

4. **Approx. 5 minutes later,** all four deputies (<u>Mayfield, Campbell, Ramadas and Laszuk</u>) arrive.

5. As they exit the vehicle, Deputy Mayfield greets and hugs a volunteer in the parking lot. As they observe and record on their video, Bolbol remarks that the deputy hugs one of the employees and she exclaims "<u>We have a lawsuit! Here we go.</u>" (Plaintiff's Video 14- Video 2).

6. **First encounter between Deputies & Protesters: At approx. 17:57-17:59 [5:57-5:59 pm]**, Deputies meet with Cuviello and Bolbol.  As Deputy Campbell attempts to advise ground rules for a lawful free speech assembly, BWC video captures his attempts to speak with the protesters saying "Free speech…totally cool..we just ask..play nice….They want you to move to."- when he is interrupted by Bolbol, saying: "We are not going to."  Bolbol continues to interrupt him, but the deputy maintains a professional demeanor (County's Videos 3-5 and Plaintiffs' Video 14- Video 2).

7. **At 18:01:36 [6:01 pm],** From a dispatch print out titled "Event Register"- "CPU" Mayfield responds that they have already talked to the subjects and advised them of the designated protest area.

8. Additional protesters arrive to upper entrance: Michael Sage, Robyn Newkirk and Keith Radcliff.

9. **18:08 [6:08 pm],** Park Security/Ranger Kevin Hart appears.  <u>Deputy Mayfield again advises Cuviello and Bolbol</u>, mentioning the designated area.  Bolbol and Cuviello are abrasive and agitated and refuse to relocate to the Free Speech zone.  There is no attempt to force them there and no threat of arrest. (County's Video 6 and Plaintiffs' Video 16-Clip 2.)

**At 18:11-[6:11 pm],** Deputy Mayfield steps away to make a phone call to give an update on the rodeo event with duty Sergeant Moises Gomez. While Dep. Mayfield is on the phone, Bolbol and Cuviello discuss him being on the phone, believing that Dep. Mayfield is speaking with his "watch commander." (County's Video 7; Plaintiffs' Video 14-Video 3 and Video 16-Clip 2.)

**At 18:16 [6:16 pm],** Dep. Mayfield gets off the phone and speaks with Kevin Hart and a female Rowell Ranch employee; Gary Houts joins the conversation. (County's Videos 6 and 8 and Plaintiffs' Video 14-Video 3 and Video 16-Clip 2.)

While Dep. Mayfield is talking with Hart and the Rowell Ranch employees, Bolbol and Cuviello discuss Dep. Mayfield "not being allowed to arrest us..." (Plaintiffs' Video 14-Video 3 and Video 16-Clip 2.)

Bolbol then runs over to Sage, who is interacting with Houts, closer to the Upper Entrance. (Plaintiffs' Video 14 Video-3.)

Cuviello also engages in a discussion with Newkirk and Radcliff about Dep. Mayfield, "I knew that big cop was an asshole from the get go…" (Plaintiffs' Video 16-Clip 2.)

Also, when Dep. Mayfield is talking with Hart and the Rowell Ranch employees, Bolbol engages in a conversation with Sage about Dep. Mayfield, "He really wanted to arrest us, but he doesn't get to…" (Plaintiffs 's Video 14-Video 3.)

**At 18:19 [6:19 pm],** Dep. Mayfield returns and speaks with Cuviello, Newkirk, Radcliff, calling over Sage and Bolbol. Bolbol immediately walks away and starts handling out leaflets closer to the Upper Entrance. (County's Videos 6 and 8 and Plaintiffs' Video 16-Clip 2.)

As Dep. Mayfield is walking away, Cuviello talks to Radcliff about Dep. Mayfield. (Plaintiffs' Video 16-Clip 2.)

10. At **18:20 [6:20 pm – 6:21 pm],** Encounter between Dep. Mayfield and Sage on the Upper Entrance pathway; Bolbol interjects and has a discussion with Dep. Mayfield. (County's Videos 6, 8 and 9.)

11. **At 18:22 [6:22 pm – 6:23 pm],** Dep. Mayfield engages in a conversation with Hart and several Rowell Ranch employees. (County's Video 10)

12. Sometime Around **18:25 [6:25 pm],** Margo [last name unknown], another protester, arrives and Cuviello engages in a conversation with her. (Plaintiffs' Video 16-Clip 3.)

13. At **18:27 [6:27 pm – 6:28 pm],** Second Encounter between Dep. Mayfield and Sage on the Upper Entrance pathway; Bolbol interjects and has a discussion with Dep. Mayfield. (County's Video 11 and Plaintiffs' Video 16-Clip 3.)

14. Sometime after **19:01 -7:01 pm,** the protesters relocate to the Lower Entrance. (County's Videos 12-14.)

15. At **19:36-19:37 – [7:36 pm],** Encounter #3 between Dep. Mayfield and Bolbol; this occurs near the Lower Entrance. (County's Video 15 and 16 and Plaintiffs' Videos 14- Video 4 and Video 16- Clip 4.)

16. At **19:37 [7:37 pm – 7:42 pm]** Encounter between Dep. Mayfield and Cuviello; they engage in a conversation about the First Amendment. (County's Video 16 and 17, and Plaintiffs' Video 16-Clip 4.)

17. At **19:42 -7:42 pm,** Bolbol approaches Dep. Mayfield and Cuviello about a group photo; the group takes photos near the Lower Entrance. (County's Videos 16 and 17, and Plaintiffs' Video 16-Clip 4; Exhibit #2 to Cuviello & Bolbol's Depositions.)

18. At **19:56 [7:56 pm],** Dep. Mayfield Leaves the Lower Entrance at Rowell Ranch at 7:56 pm – offers a sticker on his way out. (County's Videos 18 and 19.)

# 4 Expert Opinions: Analysis, Basis, and Reasons Thereof

My opinions are informed by the behaviors and actions depicted in available video evidence, case documents, , testimony, and relevant training materials and policy. I recognize that the perspectives of officers and witnesses regarding events can often vary from what recording devices capture. Furthermore, I am aware that human information processing, particularly under stress and in time-sensitive situations, is limited and does not capture information like video does. Therefore, it's possible that officers and witnesses might not be aware of all the details recorded by the video, and likewise, officers and witnesses may perceive information that the camera fails to capture.

From the videos viewed, Kevin Hart and multiple deputies attempted to speak with Cuviello and Bolbol, who reacted with resistance, interrupting and shouting. Bolbol and Cuviello insisted that they should be told if they were about to be arrested, (on multiple occasions). Cuviello, can be heard saying "You need to tell us now- If you're going to arrest me, I need to know ahead of time." He seemed to be trying to bait the officer wearing the BWC. (County's Video 6 Mayfield BWC).

The protesters hold large banners and signs off the main paths, but single protesters can be seen moving onto the path, handing the fliers, at times in a straight arm movement and causing attendees to alter their path around them.  Videos appear to show Deputy Mayfield asking the male with white hair and glasses (Sage) to refrain from blocking attendees and to remain off the path.  Sage moves off the path, but then reverts back onto the path where he is joined by Bolbol. (County's Video 6 Mayfield BWC).

In other video segments, the protesters can be seen milling about the attendees near the restrooms and ticket booth.  Deputies ask the protesters to keep the paths clear.  (County's Video 16 Mayfield BWC).

It becomes clear from the videos that Bolbol and Cuviello appear to seek confrontation with the rodeo attendants from the beginning.  They continue to be adversarial, looking for conflict from their entrance through the gates, to resisting instructions from Public Safety Manager Hart and the Alameda County Deputies.  They and other protesters move into the path of rodeo patrons with signs and fliers, pushing them in straight arm postures, at times.  They move onto the pathway several times.  In some of the videos, vehicles can be seen and heard inching by to get past the protesters safely.  Besides appearing argumentative and antagonistic during the exchanges with Hart, employees and deputies, Bolbol and Cuviello mention "sue" and "lawsuits" multiple times. From the transcripts of their own videos, "lawsuit and lawsuits" was mentioned six times.  "Sued" was spoken by them three additional times. (County's Video  6 Mayfield BWC).

 At no time did it appear that either Cuviello nor Bolbol seemed afraid or intimidated by the deputies.  In fact, in deposition, Cuviello described the initial meeting as friendly.  At days end, the two invited the deputies to appear with them in a group photograph. Cuviello says that he did not believe the deputies were trying to disrupt the protest. He confirmed that at no time did deputies attempt to remove them, take signs, banners or leaflets from them.  An exchange

between Cuviello and Mayfield seemed conciliatory in an exchange (pages 54-55 of the BWC Audio Transcript) where Deputy Mayfield says "All we want is peace." Cuviello says "That's all we want, we're not here to cause trouble." Mayfield: "I know you're not." …..[later in the exchange- "That's why you and I are just having a conversation." Cuviello: "We're just having a conversation." (County's Video 16 Mayfield BWC).

In review of the videos posted by the demonstrators and in reading the memo by Hart, the demonstrators refused to pay the entrance fee and pushed past the gate attendants who asked for tickets. Mr. Hart continues that the demonstrators stood 'directly in front of the security entrance and mildly attempt to block visitors to the rodeo from entering the park area. They would hold their signs and shout to individual visitors …" "Complaints were received from rodeo visitors whereas they felt their peace was being disturbed." At one point in a video, a voice (patron of the rodeo) declares "Get away from me" as a male protester (Sage) stands in front of the man, wearing a sign and handing a leaflet. (County's Video 11 Mayfield BWC).

**Summary of events on May 20, 2020:**

**Initial Contact at Main Gate**

The Rowell Ranch Park was secured by permit to hold a rodeo. Tickets were required to gain entrance. Gate attendants in yellow vests were clear in their initial request to see tickets.

**Response by the Protesters**

The protesters filmed themselves entering the main gate where gate attendants asked for tickets. The protesters began shouting at the gate entrance attendants- which was intimidating to the attendants. Sporadic videoing was done by plaintiffs Cuviello & Bolbol.

The protesters brought in signs and fliers and positioned themselves at various points on the grounds- as evidenced by videos reviewed, sometimes impeding the paths of vehicles and attendees to the rodeo. They were asked not to stand in the way of vehicles and attendees. They were asked to stay off the paths to the ticket booth, bathrooms and rodeo event entrance. They were asked to set up in the designated "Free Speech" area but were not forced there. They were not deterred from their freedom of speech. There were no attempts made to quash their free speech message.

On several occasions, as the deputies attempted to engage Cuviello and Bolbol, they interrupted the deputies and ignored their requests to stay off paths and from standing directly in the paths of patrons. The two protesters were disrespectful, with Cuviello telling another protester about Deputy Mayfield "I knew that big cop was an asshole from the get-go. The tall guy." And "…I knew the big guy was a jerk from the get-go." (Plaintiffs' Video 16-Clip 02.).

**Public Safety Contact**

**Public Safety Manager Hart** and other representatives of the rodeo asked the demonstrators to protest in the designated "Free Speech Area" but they were not forced to go there and were otherwise accommodated to protest in the areas near the rodeo entrance. Attempts were made to

convey a clear message by Hart and deputies on-site, to keep pathways and roadways clear of vehicles and pedestrians.

They were not threatened with arrest by Public Safety Manager Hart, nor were they threatened with arrest by any member of the **Alameda County Sheriff**.  No threat of arrest or violence was conveyed for refusing to respond to the designated "Free Speech Area" yet appeals were made to refrain from impeding vehicles and rodeo attendees.  There was no attempt to prevent the demonstrators from holding signs, handing out leaflets or saying slogans (as some of the protesters did).  They were not asked to leave the grounds.

Several attempts were made by Hart and deputies to communicate with the demonstrators at various times but they were met with resistance and refusal. Initial blocking activity at the park entrance was made in an attempt to ask for tickets to a ticketed event.  The brusque entrance and other movements throughout the protests seemed intent on receiving an instinctive response. The blocking of the pathways with fliers pushed onto rodeo attendees was met with annoyance and resistance by patrons attempting to enter the rodeo entrance.

Deputies attempted to convey clear instructions which were repeated throughout their contacts and recorded on videos.  These instructions included that the deputies were present to protect the "Free Speech of All" and to establish clear paths for pedestrians and vehicles. Deputy Mayfield, in particular, was met with distain and rude behavior and what appeared to be a racial remark by Bolbol.  His attempts to deescalate conversations were met with verbal insults and resistance.

**Opinions in respect to the scope of the review:**

Videos presented by Cuviello and Bolbol and the ACSO Body Worn Cameras show only segments of the exchanges on the day of May 20, 2022, not a continuous depiction.

**1. Opinion One:**

**The Alameda County Sheriff's Office provided a "Duty of Care"** fitting to the situation during their presence at the Rowell Ranch Rodeo on 5/20/2022.  Deputies attempted to meet with the protesters to go over ground rules, but were met with resistance and interruptions.  Deputies remained on scene to monitor activities as they were assigned previously to the event. Deputy Mayfield advised dispatch that the protest was in hand and that protesters had been advised.  Later, Deputy Mayfield called his Sergeant to provide updates.  At no point did any deputy attempt to physically move protesters or take away banners, fliers or other materials.

Deputy Mayfield was professional and clear in his requests to the protesters.  He showed no animus towards the protesters. His content was neutral, giving information, instruction and requests.
**To Bolbol:** "I'm just asking you not to block egress." (Audio transcript page 21); "All I'm asking is that they don't block the bathroom." (Audio transcript page 56);
**To Cuviello:** In response to being told he is complaining- "Nobody's complaining, I'm simply asking to keep a clear pathway so people can…" (Audio transcript page 57); "All I'm asking you to do, is work with us." (page 58); "I'm receiving complaints that they're standing in the middle of the walkway." (page 59);

**To Sage:** ".is to stay out of the walkway so you're not blocking ingress and egress." "Yes, sir, you keep standing in the middle of the walkway." (Audio transcript page 44). "You can hand them fliers all you want—you guys can talk all you want— "Just don't stand directly in front of them, and if you can, please stay out of the walkway. That's all we're asking." (Audio transcript page 46).

**2. Opinion Two:**

**The protester/demonstrators at the Rowell Ranch Rodeo Event on May 20, 2022 were given reasonable access at the event;** a suggestion of a designated "Free Speech Area" was informed by Security /Ranger Hart and the deputies on separate occasions but was not made mandatory after the protesters refused to take a position there; no tickets were required for them to access areas outside the rodeo event.  There was no attempt made by security nor deputies to remove the protesters from the event, only asked that they remain out of the path of patron access to the event, ticket booths and restroom facilities.

From comments and exchanges, it seemed as though the area where protesters set up at the upper entrance, away from the designated area, was in question of whether it was a public area or private and permitted event.  They did not move to the lower entrance until later, by their own accord (Sage deposition page 53/53).

Public Safety Manager Hart expressed in his memorandum dated December 9, 2022:

> As visitors started to enter the park to watch the rodeo, via the security gate, there were about about 5-6 individuals walking up holding signs with graphic pictures of animal abuse to the ticket booth area.   None of these individuals made any attempt to pay an entrance fee or enter the park.  Instead,  all of these individuals began to stand directly in front of the security entrance and mildly attempt to block visitors to the rodeo from entering the park area.  They would hold their signs and shout to individual visitors and de-cry how they could watch such an event where animal abuse happens.  Complaints were received from rodeo visitors whereas they felt their peace was being disturbed.

Despite this, the protesters were not relocated, but instead were allowed to remain in the area and had to be repeatedly asked to allow clear access to patrons, staff and vehicles.

**3. Opinion Three:**

**The "time, place and manner" access were not denied due to the content of the protest:**
ACSO Deputies Mayfield and others were assigned to the event weeks before the day of the 5/20/22 date and were enroute prior to the call from Gary Houts. The protesters were not restricted in their signs, banners, speech or leaf letting activities as long as they did not impede the movement of rodeo visitors and vehicle traffic.  The suggestion was made to proceed to the designated "Free Speech Area" but when the protesters refused to go, they were not forced, nor threatened with arrest.

Hart approached the group inside the park near the ticket booth and main entrance to the rodeo event.  He attempted to explain the protest conditions and directed the protesters to the Free Speech area- which they declined and ignored or spoke over his instructions.

**4. Opinion Four:**

**Instructions given to the protesters were reasonable and in compliance with industry standards.** In my training and in my experience at numerous protests and demonstrations, it is a best practice to make contact with leaders of a protest and go over ground rules about care to avoid confrontations, to stay clear of vehicles and pedestrians and other details.  The deputies made an attempt to do just that, immediately upon their arrival. Instructions given to the protesters was reasonable and in compliance with industry standards: Attempts were made to contact the protest organizers in order to set ground rules and determine areas to avoid.  This is a law enforcement and event management standard.  One example is from the FEMA Special Events Contingency Planning course IS-15.

Deputy Mayfield, in particular, took great care in attempting to convey guidelines to the protesters.  At the initial meeting, Cuviello and Bolbol both interrupted his attempts and those of Deputy Campbell.

Campbell begins their first interaction by addressing Cuviello and Bolbol in a friendly casual manner: "Hello, How are you doing? —So we're with the sheriff's office, obviously.  We want to say hello and let you know— [interrupted by Cuviello]—we're going to be hanging out here [interrupted again] Free speech, we get that, that's totally cool."  "Basically, all we're here is to play nice; you know what I mean?" Bolbol says "Absolutely, We will. We appreciate that." Campbell responds: You're very welcome. They actually want you guys to be over in that- [cut off by Bolbol] "We know, we're not doing that."  When informed that there is a designated free speech area, Bolbol responds "We know that." Mayfield replies: "If you guys go down there, great; if you choose to stay here, just let's keep it peaceful." (BWC Audio transcript pages 6/7).

Mayfield repeated instructions in attempts to keep passage ways clear on the pavement for patrons of the rodeo.  Mayfield can be heard on one of the recordings asking Sage to move off the pavement from moving directly into the path of patrons and handing fliers directly at them. (See quotes in Opinion 1 above).

**5. Opinion Five:**

**The protesters were not threatened with arrest at the event.** There were no threats of arrest made to Cuviello, Bolbol or any of the other protesters at Rowell Ranch on 05/20/2022. Although law enforcement officers must advise a person of what they *are* being arrested, there is no requirement to advise them of what they *could* be arrested.

At various times throughout, especially in the initial meeting with Deputies, the subsequent meeting with Hart present, and the exchange with Deputy Mayfield and Sage, the plaintiffs Cuviello and Bolbol did not act intimidated or threatened by Hart or the deputies.  Instead, Cuviello and Bolbol were abrasive, interrupting the instructions and making declarations that the security staff nor deputies knew about their rights to protest.  They harangued and lectured the deputies and Hart with their perception of their rights and declared that they wanted to arrest the protesters but were denied by their commander.

They made disparaging and demeaning remarks such as when Cuviello makes a judgement about Deputy Mayfield as Mayfield exits his vehicle, several dozen feet away: "I knew that guy was an asshole from the get-go.  The tall guy." Unidentified speaker: "The one with his back to us, he's actually really nice." Cuviello: "Yeah, he was nice. He was the guy who initially talked to us, but the big guy, I knew he was a jerk from the get-go." …" But the big guy, I knew right off the bat he had a hard-on to arrest us, to do something." (Audio transcript pages 41/42).

Cuviello to Mayfield a few minutes later: I knew from the get-go when you walked up you had that energy."  Mayfield: "You don't even know me." Cuviello: I know you because I've met cops like you so many times and filed lawsuits against cops like you.  I know you like the back of my hand." (Audio transcript pages 45/46).

Cuviello later to Margo about Mayfield: "He said, you know, as long as you don't block [inaudible].  We stood over here for a while talking when they came up.  But the tall one, I knew he was an asshole." (Audio transcript page 51).

After 6:25 pm, while still talking with Margo, Cuviello, near the event closing, essentially says they were never arrested: Yeah, we know our rights and they said, are you going to move? I said, no, I'm not moving.  And everybody wouldn't move.  And I thought [inaudible] everyone, you know.  I thought that's pretty good.  Because if they would have arrested me, I would have sued them. (Audio transcript page 53).

Bolbol: "Yeah, the guy—the guy who's talking to the, I don't know, the overweight one, he really wanted to arrest us, but he doesn't get to.  His watch commander has a level head, isn't willing to beat the constitutional violation of an illegal arrest.  You know how much it would have cost this county if they would have illegally arrested us?" (Audio transcript page 20).

Bolbol berates Mayfield: "You need to learn about free speech. You need—you know what? I'm going to write a letter telling you deputies, you need to learn—your compadres, I don't know about you, but the white guy, he was—he knew what he was talking about.  You should learn from him.  It's too bad you have seniority over him." (Audio transcripts page 23).  I interpreted the meaning to be belittling and with racial overtones.  In her recent March 6, 2024 deposition, it seems Bolbol makes a conscious reference to her descriptions of the deputies when she says: Well, yeah. The first time—I don't know how to describe people except by saying the color they are, so I can't—don't know his name.  I could call him young, but that really doesn't say much, because there were other young ones.  So, I'm going to say the white guy and the African-American guy and the Indian gal.  That's the way I'm going to refer to them, and I don't mean to be, you know, racist in any way.  It's just a descriptor." (Bolbol deposition page 47).

Cuviello declares throughout that he has successfully sued those who attempted to interrupt his protests.  His pattern of telling law officers to "call their commander" is repeated to Mayfield (BWC transcript page 3 & 16).  In his deposition on February 20, 2024, Cuviello said: It's my experience that the officers on the street aren't as respectful of our rights as I think they should be, and we've had them call their watch commanders, who seem to be more knowledgeable maybe. And, like my experience in 2018 or 2019, you know, "Call the Watch Commander," and the watch commander said "Everything's good, and so I said, "call the watch commander

because I think—in my experience, like I said, is he's going to know more than you, so please call the watch commander." (Cuviello deposition page 87).

Cuviello to Hart: "No, you're done, you're finished. I'm not going. Period." Hart responds "Just let me finish" Cuviello: "I'm not going, I'm not going. You can ask me nicely here; I do not give up my rights no matter how nicely somebody asks me." (BWC transcript page 17/18).

At 6:25 pm after the interaction with the deputies, Cuviello can be heard saying to protester Margo that "Yeah, yeah, we had a bit of a problem with the police, but everything's ironed out. That's why I'm video recording." (Audio transcript page 51).

The tone was set for interactions with deputies when Cuviello expressed preconceived opinions that he thought Deputy Mayfield "was an asshole from the get-go" when he first saw him get out of his car in the parking lot.  In his deposition, Cuviello reiterated when asked why he thought Deputy Mayfield "was an asshole" Cuviello said "He had this, like, tough guy energy, like you know, he's going to come over and tell us we have to go to the free speech area or whatever, which he ended up doing eventually.  But that was the energy that I got from him." (Cuviello deposition page 94).

At no time, did it appear that the protesters, specifically Cuviello and Bolbol, seemed fearful or afraid of being arrested.  In response to asking repeatedly if they were to be arrested, Bolbol said "No one said you're *not* going to be arrested…" (Bolbol deposition page 53).

At approximately 19:42 or so, in their final exchange between Deputy Mayfield and Cuviello, they had a civil and cordial conversation about the importance of the constitution, that they agreed upon.  Just before leaving the grounds, the protesters set up with their banner to take a group photo.  There was a joking exchange about Mayfield appearing with them in the group photo.

After reviewing the materials provided, it is in my professional opinion that the protesters, specifically Mr. Pat Cuviello and Ms. Deniz Bolbol seemed intent on confronting law enforcement and security at the rodeo to draw attention and create conflict.  The demands that were made to Public Safety Manager Hart and to the ACSO Deputies seemed intent to explicitly say that if Cuviello, Bolbol and the others did not move from their location and relocate to the 'Free Speech Area' that they would be arrested.  Indeed, no one ever said that to protesters. It is proven by the fact that there were no arrests made, even though the protesters remained at walkways, in front of ticket booths, restrooms and to the entrance to the rodeo events.

Prepared by:

*James I. Dudley*

James I. Dudley                                                              05/23/2024

**ATTACHMENT A**

Federal Rules of Civil Procedure 26(a) (2) (B) 3 4 (B)

Witnesses Who Must Provide a Written Report. Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:

(i)      a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii)     the facts or data considered by the witness in forming them;

(iii)    any exhibits that will be used to summarize or support them;

(iv)    the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v)     a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi)    a statement of the compensation to be paid for the study and testimony in the case.

**ATTACHMENT B**

Federal Rules of Evidence 702

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent has demonstrated by a preponderance of the evidence that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of 9 fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

ATTACHMENT C

Materials Reviewed, Facts or Data Considered, and Exhibits Federal Rules of Civil Procedure 26(a) (2) (B) (ii); 26(a) (2) (B) (iii)

I reviewed, considered, referenced, or recollected the following materials during my analysis of this case and the construction of this report. Primary case materials were provided by counsel, while secondary materials are the product of my research and/or consideration.

All documents and materials or portions thereof are potential exhibits for purposes of FRCP 26(a) (2)(B)(iii) including formatting such as demonstrative evidence (example: slide decks).

Materials reviewed, Facts or Data Considered, and Exhibits that will be used to summarize or support opinions are inclusive of any of those referenced or footnoted in the report that may or may not be delineated below.

**Materials Reviewed**

Documents Reviewed:

1.    Kevin Hart memo dated December 9, 2022 (2 pages)

2.    Motion for TRO dated May 9, 2023 (1 page)

3.   "Rowell Ranch Special Events Paperwork" (RRSEP) from Hayward Area Recreation District (HARD) dated May 13, 2022 (26 pages)

4.   "Emergency Operations Plan" not dated (12 pages)

5.   "Site Map 2022" (1 page) (+Google Map)

6.   "Second Verified Amended Complaint for Injunctive and Declaratory Relief and Damages" dated 06/20/2023 (28 pages)

7.    Cache of 36 Videos of Body Worn Cameras (BWC) of Alameda County Sheriff Deputies, Body cam videos produced by the County and video by demonstrators Cuviello and Bolbol.

8.    Transcripts of the videos.

9.    A timeline of Events (provided by ACSO).

10.  Depositions of Deniz Bolbol & Pat Cuviello.

11.  Audio Transcriptions.

12.  Other related documents and maps.

13.   Event Dispatch printout- Communications/Mayfield.

14.   The parties' responses to written discovery.

15.   Documents produced by the parties, including a recording by the Sheriff's Office of two calls regarding the rodeo made on May 20, 2022

16.  Deposition transcripts of both plaintiffs, Michael Sage, and Robyn Newkirk, and exhibits thereto.

17.  A time-stamped chronology of the videos.

18.  Declarations submitted to the Court in connection with plaintiffs' Motion for a Temporary Restraining Order (Russel Fields (initial and supplemental), Natalie Wong, and Marcus Cox.

19. "Rowell Ranch Rodeo Inc. First Amendment Right Guidelines"

20. California POST Learning Domain 2

21.  MWDC"x0CI TKEWWWTCN'CUUQEKCVKQP'"%4226+

Wpkgf "Uvcvgu'Eqwtv'qh'Crrgcru."Pkpvj "Ektewku0'Pq 24/38; ;; 0'Fgekfgf <'Qevqdgt '3; .'4226

22. California Penal Codes

**CA Penal Code Section 647c**

Every person who willfully and maliciously obstructs the free movement of any person on any street, sidewalk, or other public place or on or in any place open to the public is guilty of a misdemeanor. Nothing in this section affects the power of a county or a city to regulate conduct upon a street, sidewalk, or other public place or on or in a place open to the public.

*Source: Section 647c*, https://leginfo.legislature.ca.gov/faces/codes_displaySection.-xhtml?lawCode=PEN§ionNum=647c..

**CA Penal Code Section 372**

Every person who maintains or commits any public nuisance, the punishment for which is not otherwise prescribed, or who willfully omits to perform any legal duty relating to the removal of a public nuisance, is guilty of a misdemeanor.

*Source: Section 372*, https://leginfo.legislature.ca.gov/faces/codes_displaySection.-xhtml?lawCode=PEN§ionNum=372..

Time Line for May 20, 2022:

1. Sometime after 5:30 pm Cuviello & Bolbol enter Rowell Ranch and set up near the Upper Entrance. (Primary Plaintiffs 16-Clip 1; Secondary Plaintiffs 14 – Video 1.)

2. Sometime around 5:45/5:50 pm Cuviello & Bolbol's Encounter with Rowell Ranch Employee, Gary Houts. (Plaintiffs 14- Video 2 and 16-Clip 1.)

3. 5:51 pm Houts calls ACSO Dispatch. (Primary ACSO Dispatch Recording and Event Register; Secondary Plaintiffs 16-Clip 1 and 14-Video 2.)

4. Sometime before 5:57 pm ACSO Deputies Dep. Joshua Mayfield, Dep. Christian Campbell, Dep. Matthew Laszuk, and Dep. Sowmya Ramadas arrive at the Rowell Ranch Rodeo. (County Videos # 3-5.)

5. Something before 5:57 pm Dep. Mayfield hugs Rowell Ranch volunteer Ashley Strassberg. (Plaintiffs 14-Video 2.)

6. 5:57 pm -5:59 pm Encounter #1 between ACSO Deputies and Cuviello & Bolbol. (County Videos # 3-5.)

7. 6:01 pm ACSO Dispatch speaks with Dep. Mayfield [CPU3]. (ACSO Dispatch Recording and Event Register)

8. Sometime between 6:01 pm and 6:08 pm Additional protesters Michael Sage, Robyn Newkirk, and Keith Radcliff, III (Robyn's boyfriend) arrive at the Upper Entrance of the Rowell Ranch Rodeo. (County Video # 6)

9. 6:08 pm Encounter #2 between Dep. Mayfield and Cuviello & Bolbol; Kevin Hart's 1st Interaction with Cuviello & Bolbol. (County Video #6; Plaintiffs 16-Clip 2.)

a. 6:11 pm Dep. Mayfield gets on his cell phone, walks away, and turns off his body camera. (County Videos #6 and 7.) *Dep. Mayfield speaks with the Sergeant on Duty, Sgt. Moises Gomez. While Dep. Mayfield is on the phone, Bolbol and Cuviello discuss him being on the phone, believing that Dep. Mayfield is speaking with his "watch commander." (County Video # 7; Plaintiffs 14-Video 3 and 16-Clip 2.)

b. 6:16 pm Dep. Mayfield gets off the phone and speaks with Kevin Hart and a female Rowell Ranch employee; Gary Houts joins the conversation. (County Videos #6 and 7.) While Dep. Mayfield is talking with Hart and the Rowell Ranch employees, Bolbol and Cuviello discuss Dep. Mayfield "not being allowed to arrest us..." (Plaintiffs 14-Video 3 and 16-Clip 2.) Bolbol then runs over to Sage, who is interacting with Houts, closer to the Upper Entrance. (Plaintiffs 14 Video-3.) Cuviello also engages in a discussion with Newkirk and Radcliff about Dep. Mayfield, "I knew that big cop was an asshole from the get go…" (Plaintiffs 16-Clip 2.) Also, when Dep. Mayfield is talking with Hart and the Rowell Ranch employees, Bolbol engages in a conversation with Sage about Dep. Mayfield, "He really wanted to arrest us, but he doesn't get to…" (Plaintiffs 14-Video 3.)

c. 6:19 pm Dep. Mayfield returns and speaks with Cuviello, Newkirk, Radcliff, calling over Sage and Bolbol. Bolbol immediately walks away and starts handling out leaflets closer to the Upper Entrance. (County Videos #6 and 8; Plaintiffs 16-Clip 2.) As Dep. Mayfield is walking away, Cuviello talks to Radcliff about Dep. Mayfield. (Plaintiffs 16-Clip 2.)

10. 6:20 pm – 6:21 pm First Encounter between Dep. Mayfield and Sage on the Upper Entrance pathway; Bolbol interjects and has a discussion with Dep. Mayfield. (Primary County Video # 6; Secondary County Videos # 8 and 9.)

11. 6:22 pm – 6:23 pm Dep. Mayfield engages in a conversation with Hart and several Rowell Ranch employees. (County Video # 10)

12. Sometime Around 6:25 pm Margo [last name unknown], another protester, arrives and Cuviello engages in a conversation with her. (Plaintiffs 16-Clip 3.)

13. 6:27 pm – 6:28 pm Second Encounter between Dep. Mayfield and Sag on the Upper Entrance pathway; Bolbol interjects and has a discussion with Dep. Mayfield. (Primary County Video # 11; Secondary Plaintiffs 16-Clip 3 which is only video/no sound of this interaction.)

14. Sometime after 7:01 pm At some time after 7:01 pm, the protesters relocate to the Lower Entrance. (County Videos #12-14.)

15. 7:36 pm – 7:37 pm Encounter #3 between Dep. Mayfield and Bolbol; this occurs near the Lower Entrance. (Primary County Video #16; Secondary County Video #15; Plaintiffs 14-Video 4 and 16- Clip 4.)

16. 7:37 pm – 7:42 pm Encounter #3 between Dep. Mayfield and Cuviello; they engage in a conversation about the First Amendment. (Primary County Video #16; Plaintiffs' Bate 16-Clip 4; Secondary County Video #17)

17. 7:42 pm Bolbol approaches Dep. Mayfield and Cuviello about a group photo; the group ultimate takes photos near the Lower Entrance. (County Videos #16 and 17; Plaintiffs 16-Clip 4; Exhibit #2 to Cuviello & Bolbol's Depositions.)

18. 7:56 pm Dep. Mayfield Leaves Rowell Ranch at 7:56 pm (County Videos # 18 and 19.)

A. Invitatory of Videos: *the ACSO bodycam videos are time-stamped per Coordinated Time (UTC), the successor to Greenwich Mean Time. Thus, a time stamp on the video of 12:57 am UTC is actually 5:57 pm PDT – UTC is 7 hours ahead of CA during PDT.

County's Videos: X603994B1 = Dep. Joshua Mayfield X603995M6 = Dep. Christian Campbell X6039A6A9 = Dep. Matthew Laszuk X60A15126 = Dep. Sowmya Ramadas

1. (Clip_1.1) _Axon_Body_3_Video_2022-05-20_1808_X603994B1 = Dep. Mayfield's bodycam - starts at 6:08 pm and ends at 6:09 pm (part of Encounter #2 with Cuviello and Bolbol)

2. (Clip_1.1) _Axon_Body_3_Video_2022-05-20_1936_X603994B1 = Dep. Mayfield's bodycam - start at 7:36 pm (part of Encounter #3 with Bolbol)

3. Axon_Body_3_Video_2022-05-20_1757_X603994B1 = Dep. Mayfield's bodycam – starts at 5:57 pm, ends at 5:59 pm (Encounter #1 with Cuviello and Bolbol)

4. Axon_Body_3_Video_2022-05-20_1757_X603995M6 = Dep. Campbell's bodycam – starts at 5:57 pm, ends at 5:59 pm (Encounter #1 with Cuviello and Bolbol)

5. Axon_Body_3_Video_2022-05-20_1758_X6039A6A9 = Dep. Laszuk bodycam – starts at 5:58 pm, ends at 5:59 pm (Encounter #1 with Cuviello and Bolbol)

6. Axon_Body_3_Video_2022-05-20_1808_X603994B1 = Dep. Mayfield's bodycam starts at 6:08 pm, ends at 6:21 pm (Encounter #2 with Cuviello and Bolbol)

7. Axon_Body_3_Video_2022-05-20_1810_X6039A6A9 = Dep. Laszuk's bodycam - starts at 6:10 pm, ends at 6:16 pm (Part of Encounter #2 with Cuviello and Bolbol)

8. Axon_Body_3_Video_2022-05-20_1819_X6039A6A9 = Dep. Laszuk bodycam – starts at 6:19 pm, ends at 6:21 pm (Dep. Mayfield Speaking with Hart and Rowell Ranch Employee)

9. Axon_Body_3_Video_2022-05-20_1820_X603995M6 = Dep. Campbell's bodycam - starts at 6:20 pm, ends at 6:22 pm (Dep. Mayfield Speaking with Sage; Bolbol Interjects)

10. Axon_Body_3_Video_2022-05-20_1822_X603994B1 = Dep. Mayfield's bodycam - starts at 6:22 pm, ends at 6:23 pm (Dep. Mayfield speaking with Hart and Rowell Ranch Employees)

11. Axon_Body_3_Video_2022-05-20_1826_X603994B1 = Dep. Mayfield's bodycam -starts at 6:26 pm, ends at 6:28 pm (Dep. Mayfield Speaking with Sage; Bolbol Interjects)

12. Axon_Body_3_Video_2022-05-20_1900_X60A15126 = Dep. Ramadas' bodycam - starts at 7:00 pm, ends at 7:01 pm

13. Axon_Body_3_Video_2022-05-20_1900_X603994B1 = Dep. Mayfield's bodycam - starts at 7:00 pm, ends at 7:01 pm

14. Axon_Body_3_Video_2022-05-20_1901_X6039A6A9 = Dep. Laszuk's bodycam- starts at 7:01 pm, ends at 7:01 pm

15. Axon_Body_3_Video_2022-05-20_1936_X60A15126 = Dep. Ramadas' bodycam - starts at 7:36 pm, ends at 7:37 pm (Encounter #3 with Bolbol)

16. Axon_Body_3_Video_2022-05-20_1936_X603994B1 = Dep. Mayfield's bodycam - starts at 7:36 pm, ends at-7:43 pm (Encounter # 3 with Bolbol and then Cuviello)

17. Axon_Body_3_Video_2022-05-20_1941_X60A15126 = Dep. Ramadas' bodycam - starts at 7:41 pm, ends at 7:43 pm (Part of Encounter #3 with Cuviello)

18. Axon_Body_3_Video_2022-05-20_1956_X60A15126 = Dep. Mayfield's bodycam - starts at 7:56 pm (less than 1 minute) (Dep. Mayfield Leaving)

19. Axon_Body_3_Video_2022-05-20_1956_X603994B1 = Dep. Mayfield's bodycam - starts at 7:56 pm, ends (less than 1 minute) (Dep. Mayfield Leaving)

Plaintiff's Videos:

1. Bate 1 – Bolbol's video (Ex. A to Bolbol's Decl.) (Part of Rowell Ranch Employees' Initial Interaction with Cuviello and Bolbol; Houts' Call to ACSO Dispatch; and Encounter #1 with ACSO Deputies)

2. Bate 2 – Bolbol's video (Exhibit B to Bolbol's Decl.) (Part of Encounter #2 with Hart and Dep. Mayfield)

3. Bate 3 – Bolbol's video (Exhibit B to Bolbol's Decl.) (Bolbol's Interaction with Houts for Allegedly Touching Sage)

4. Bate 4 – Bolbol's video (Exhibit C to Bolbol's Decl.) (Part of Encounter #3 Between Dep. Mayfield and Bolbol)

5. Bate 5 – Bolbol's video (Exhibit D to Bolbol's Decl.) – this May 21, 2022

6. Bate 6 – Cuviello video (Exhibit D to Cuviello's Decl.) (Cuviello and Bolbol Entering the Rodeo)

7. Bate 7 - Cuviello video (Exhibit D to Cuviello's Decl.) (Part of Rowell Ranch Employees' Initial Interaction with Cuviello and Bolbol and Houts Call to ACSO Dispatch)

8. Bate 8 - Cuviello video (Exhibit E to Cuviello's Decl.) (Part of Encounter #2 with Hart and Dep. Mayfield)

9. Bate 9- Cuviello video (Exhibit E to Cuviello's Decl.) (Part of Encounter #2 with Dep. Mayfield)

10. Bate 10- Cuviello video (Exhibit F to Cuviello's Decl.) (Margo's Arrival)

11. Bate 11- Cuviello video (Exhibit G to Cuviello's Decl.) (Part of Encounter #3 with Bolbol and Dep. Mayfield; Encounter #3 with Cuviello and Dep. Mayfield)

12. Bate 12 - Cuviello video (Exhibit I to Cuviello's Decl.)- this 5/21/22

13. Bate 13 - Cuviello video (Exhibit J to Cuviello's Decl.) – this is 5/21/22.

14. Bate 14 – Bolbol's video taken 5/20/22 a. Video 1 -(Cuviello and Bolbol entering the Rowell Ranch, and setting up). b. Video 2 - (Houts' Initial Interaction with Cuviello and Bolbol; Houts' Call to ACSO Dispatch; and Encounter #1 with the ACSO Deputies and Cuviello and Bolbol). c. Video 3 - (Part of Encounter #2 with Hart and Dep. Mayfield) d. Video 4 - (Part of Encounter #3 with Bolbol and Dep. Mayfield)

15. Bate 15 – Bolbol's video taken 5/21/22 a. Video 1 - (Cuviello and Bolbol entering Rowell Ranch.) b. Video 2 -(Interaction between Rowell Ranch Employee and Cuviello and Bolbol.)

16. Bate 16 – Cuviello Video taken on 5/20/22 a. Clip 1 - (Cuviello and Bolbol Entering the Rowell Ranch and Initial Interaction with Rowell Ranch Employees) b. Clip 2 - (Encounter #2 with Hart and Dep. Mayfield) c. Clip 3 - (Margo's Arrival) d. Clip 4 - (Part of Encounter #3 with Bolbol and Dep. Mayfield; Encounter #3 with Dep. Mayfield and Cuviello.)

17. Bate 17 - Cuviello Video taken on 5/21/22 a. Video 1 – (Cuviello and Bolbol Entering Rowell Ranch) b. Video 2 – (Cuviello and Bolbol's Interaction with Rowell Ranch Employees) c. Video 3 - (Bolbol standing by the entrance as people enter the Rodeo) d. Video 4 – (Bolbol standing by the entrance as people enter the Rodeo) e. Video 5 – (Rowell Ranch employee talking with ACSO Deputy) f. Video 6 – (Cuviello and Bolbol's Interaction with Rowell Ranch employee in golf cart) g. Video 7 – (Cuviello entering Rowell Ranch)

**Literature Review (updated 05/23/24)**

1. Alikhan, Arif (February, 2024), "The Constitutional Purpose of Policing," Police Chief Magazine, IACP.ORG

e-link: https://www.policechiefmagazine.org/chiefs-counsel-the-constitutional-purpose-of-policing/

2. California Commission on Peace Officer Standards and Training, Basic Course Workbook 26 Series- Learning Domain 2: The Criminal Justice System Updated 27 April, 2020.

https://post.ca.gov/portals/0/post_docs/basic_course_resources/workbooks/LD_02_V-6.4.pdf

3. Distel, Christopher D.; (2023), "First Amendment Audits: How to Prepare Your Officers," FBINAA.ORG

https://cld.bz/users/user-sA5xd3d/Associate-Magazine-FBINAA-Q2-2023/10/

4. FEMA Special Events Contingency Planning course

https://training.fema.gov/emiweb/downloads/is15aspecialeventsplanning-jamanual.pdf

5. Kozlowski, James C.  (2006) "Free Speech and Public/Private Events," Law Review

https://mason.gmu.edu/~jkozlows/lawarts/04APR06.pdf

6. Phillips, Robert (December, 2023) Free Speech, the First Amendment, and Time, Place and Manner Restrictions in Public Places," Legalupdates.com

https://legalupdates.com/cases/free-speech-first-amendment-and-time-place-and-manner-restrictions-public-spaces

7. Major Cities Chiefs Association, (April, 2021), "Law Enforcement Response to First Amendment Assemblies: Best Practices and Tactics," MCCA

https://majorcitieschiefs.com/wp-content/uploads/2021/05/MCCA-First-Amendment-Assembly-Working-Group-Final-Report.pdf

8. Vega, Jose, (2024), "Civil Unrest and Protest Issues: Protest Procedures and Actions," FBINAA.ORG

https://cld.bz/users/user-sA5xd3d/ASSOCIATE-Magazine-FBINAA-Q1-2024/13/

Additional articles/info regarding leaflet/fliers that generally show blocking paths are not permitted.  Each shows a modified recommendation.  The NY version shows their version and allowance:

9. Legal Aid Society- 5/2024

https://legalaidnyc.org/get-help/arrests-policing/what-you-need-to-know-about-protesting/

10. ACLU of Southern California- 05/2024

https://www.aclusocal.org/en/know-your-rights/protesters

11. NYCLU Rights-05/2024

https://www.nyclu.org/resources/know-your-rights/your-rights-demonstrating-new-york-city

# ATTACHMENT D

Qualifications Federal Rules of Civil Procedure 26(a)(2)(B)(iv)

**JAMES I. DUDLEY**

718 Crompton Road, Redwood City, CA 94061 | 415-850-4832 | jid1946@gmail.com
Public Safety Subject-Matter Expert, Consultant, Educator, Writer.

I was hired by the San Francisco Airport Police in June, 1979, where I was a police officer.
I was hired by the San Francisco Police Department in July, 1980 where I attended the SFPD Police Academy and earned the California Police Officers Standards and Training (POST) Basic Certificate.  I later earned California POST Intermediate, Advanced, Supervisory, and Management & Executive Certificates over my career.

I served in patrol for my first 10 years in a variety of capacities in the Northern District of San Francisco. As a Patrol Officer, I attended several dozen demonstrations and protests.

I was promoted to Sergeant/Inspector in 1990 where I served in the Investigations Bureau, assigned to Property Crime (Auto Theft & Burglary) and Personal Crimes (Violent Assaults, Domestic Violence and other personal crimes).

I was promoted to Lieutenant, in 1995, assigned to the Taraval District, and then to the Legal Division. During my time in the rank, I was assigned several times as a Platoon Leader for personnel assigned to various protests and demonstrations.

I was promoted to Captain in 1998, and was assigned various commands (Juvenile Division, Park Station, Central Station and the Special Operations Bureau).  As Captain I was in charge of numerous protests and demonstrations, responsible for planning, deployment and management of the incidents.

I was appointed Commander of Patrol and then Special Operations and Homeland Security in 2002-2004 and then again from 2009-2011.  In this capacity, I had several occasions to be in charge of protests and demonstrations.  While at Special Operations, I oversaw the Tactical Units, SWAT and Specialists- often primarily charged with managing large demonstrations and protests.

I was promoted to Deputy Chief of Patrol and Investigations in 2011, serving temporarily in Administration and Special Operations.  I oversaw demonstrations and protests in this capacity as well.

Over the course of my career, with San Francisco being a focal point for demonstrations and protests over war, union disputes, political issues, or other situations, it was common practice to train annually in crowd control and in review of department policies regarding First Amendment activities.

**EDUCATION**

University of California, Irvine
Irvine, CA 92697
Masters Advanced Study, Criminology                                    **2015**

San Francisco State University
1600 Holloway Avenue (PACE HSS 261)
San Francisco, CA 94132
B.A. in Criminal Justice                                               **2000**

FBI National Academy
Quantico, Virginia 22135
Graduate of the 192nd Class                                            **1998**
Law Enforcement Executive Training

**AWARDS**

Golden Key Society Honors (UCI)                                  June 2015
Gold Medal of Valor, SFPD                                       December 1989
Latino Police Officer of the Year, CLPOA                        December 1989

**TEACHING EXPERIENCE**

**San Francisco State University**
**Lecturer Faculty in Criminal Justice Studies**                **2013-Present**

**Classes in Police and Public Policy, Research Methods in**
**Criminal Justice, Crime, Data & Analysis, & Ethics**

**Instructor for California Police Officers Standards and Training (POST)**   **2000-2009**
**Investigative Problem Solving for the Institute of Criminal Investigation (ICI)**
**Community Policing Section Instructor for the CSU PD Citizen's Academy**   **2018-present**

**RELATED EXPERIENCE**

**PoliceOne.com (https://www.policeone.com/ )**
**Columnist and Podcaster**                                      **2015- present**
Podcast co-host; speaking on a variety of law enforcement issues

**Public Safety Strategies Group (PSSG) (http://www.publicsafetystrategies.com/ )**
**Senior Project Manager**                                       **June 2013**
**Police Practices Consultant**

**JD Consulting- Principal**
**Police Practice and Security Consultant & CPTED Professional**   **2013- Present**

**Presenter on Public Safety Recruiting with Interviewnow.io**
**2019-present**

Presented at SFSU, California Highway Patrol, FBI National
Conference in Orlando, Fla., California Police Officers Association,
San Diego & California Sheriff's Association Conference

**Presenter on Bringing University Pedagogy to Law Enforcement
Training          2021-present**

Presented at the National Field Training Officer Conference in
Louisville, Ky.
Presented at the International Law Enforcement Educators and
Teachers Association in St. Louis, Missouri

**Police Officer, Sergeant, Inspector, Lieutenant, Captain, Commander, Deputy Chief
Patrol, Investigations, Administration Airport Bureau, Special Operations, Homeland Security
& Special Events**

**San Francisco Police Department
([http://sanfranciscopolice.org/](http://sanfranciscopolice.org/) )
1245 3rd Street, 6th floor, San Francisco, Ca 94158                    1980- 2013**

**MEMBERSHIPS**

FBI National Academy Associates (FBINAA) Life Member
International Association of Chiefs of Police (IACP)
Police Executive Research Forum (PERF) Life Member
California Police Officer's Association (CPOA)
International Law Enforcement Educators and Trainers Association (ILEETA)
Crime Prevention Through Environmental Design (CPTED) Professional Designation
International Police Association (IPA)
LAPSEN

Board Member of the 100 Club of San Mateo County

Advisory Board Member of the San Mateo County Community College District, Administration of
Justice Program at the College of San Mateo

**ATTACHMENT E**

Ten-Year Publication History 3 Federal Rules of Civil Procedure 26(a)(2)(B)(iv)

2024

https://www.police1.com/incident-management/from-celebrations-to-crises-a-guide-to-pace-planning-for-special-event-response

https://www.police1.com/state-your-case/state-your-case-should-off-duty-police-officers-be-permitted-to-use-marijuana-in-legalized-states

https://www.police1.com/6-ways-to-reduce-traffic-injuries-and-fatalities-in-2024

2022

https://www.police1.com/police-recruiting/articles/a-13-step-plan-for-speeding-up-the-police-recruitment-process-VSMf2Hff0IWlmCaT/

https://www.police1.com/mass-casualty/articles/the-importance-of-after-action-reviews-in-informing-future-response-to-major-incidents-SM5cgGeKRI4rFPap/

2021

https://www.police1.com/chiefs-sheriffs/articles/incorporating-the-tenth-man-concept-into-critical-decision-making-TXuMkB74BZFN9LCo/

https://www.police1.com/chiefs-sheriffs/articles/the-fallout-from-the-defund-movement-Llk9sMyCcpcrw34c/

https://www.police1.com/chiefs-sheriffs/articles/critical-planning-for-high-profile-events-XRRPsJYPOZdMDbDZ/

2020

https://www.police1.com/drug-interdiction-narcotics/articles/the-de-criminalization-of-street-drugs-and-narcotics-dXqEcBUyCO7TLFrP/

https://www.police1.com/policing-era-legal-marijuana/articles/p1-research-the-marijuana-conundrum-in-law-enforcement-xYMwut1vMUH6rcxn/

https://www.police1.com/school-safety/articles/the-consequences-of-clery-act-non-compliance-TFpwrjLUAWtVkze8/

https://www.police1.com/community-policing/articles/the-problems-with-defunding-the-police-I9WamGx5W34asSJi/

https://www.police1.com/patrol-issues/articles/keep-an-eye-out-for-child-abuse-during-shelter-in-place-orders-YrWoeFqHnAf1qqD5/

https://www.police1.com/coronavirus-covid-19/articles/the-next-steps-in-curtailing-calls-for-service-eEpCFiIRed9esWjW/

https://www.police1.com/coronavirus-covid-19/articles/covid-19-curfews-understanding-enforcement-expectations-pcdK9aVP0uL9Y0dG/

https://www.police1.com/police-products/infection-control/articles/law-enforcement-planning-for-coronavirus-staffing-impacts-p5puqsWqihV2O8mj/

https://www.police1.com/police-products/infection-control/articles/covid-19-an-8-step-response-plan-for-police-leaders-2UveMCyCHSSyreqY/

https://www.police1.com/chiefs-sheriffs/articles/knowing-when-to-push-the-chair-KPOXb1q2sjonFJlp/

2019

https://www.police1.com/patrol-issues/articles/6-reasons-why-cpted-should-be-part-of-every-agencys-crime-fighting-plan-lSdYBoAU9d2R7jMI/

https://www.police1.com/police-products/pursuit-management-technology/articles/how-police-leadership-handles-the-aftermath-of-a-deadly-pursuit-3DGLnuhr0iIK75dN/

https://www.police1.com/crowd-control/articles/why-every-pd-needs-a-pace-plan-in-place-before-the-next-protest-m9Oe891ijlYrISsw/

https://www.police1.com/gun-legislation-law-enforcement/articles/columbine-copycat-a-case-for-red-flag-investigations-zT1qbUBWnGjP2Xm9/

https://www.police1.com/police-recruiting/articles/6-best-practices-that-should-be-part-of-every-agencys-retention-strategy-FrtBBwlBThXRFy88/

https://www.police1.com/chiefs-sheriffs/articles/heres-what-keeps-rank-and-file-officers-up-at-night-UgFTf5bYVMFZpMU2/

https://www.police1.com/chiefs-sheriffs/articles/6-best-practices-that-should-be-part-of-every-agencys-recruitment-strategy-in-2019-3SSuSm4Gs7TFhNzR/

2018

https://www.police1.com/police-products/narcotics-identification/articles/9-le-strategies-to-win-the-fight-against-opioids-A6CysUrGssSGxgIb/

https://www.police1.com/health-fitness/articles/how-to-launch-a-successful-peer-support-program-DltDMehcOKSk06IQ/

https://www.police1.com/chiefs-sheriffs/articles/after-the-news-breaks-6-steps-for-police-leaders-hJvJLtygWAbtiB12/

https://www.police1.com/bounty-hunter/articles/policing-in-the-era-of-the-new-vigilantes-x78venL6TbjDXdF7/

https://www.police1.com/evergreen/articles/why-we-need-cops-to-protect-and-serve-not-stand-and-wait-7ivommSGgj3HUOfc/

https://www.police1.com/active-shooter/articles/how-police-fire-and-ems-can-coordinate-active-shooter-response-6nt9nTOn4n6Y9qCi/

https://www.police1.com/chiefs-sheriffs/articles/how-to-support-your-sergeant-and-why-you-should-zR4pUPztJmxtdMc0/

https://www.police1.com/chiefs-sheriffs/articles/why-police-sergeants-are-an-agencys-mvp-fSbBdCfwsJ3bIyWh/

2014

https://www.police1.com/officer-safety/articles/why-police-agencies-are-well-served-by-the-1033-program-RRF7j3XO6xdkf5Zm/

**ATTACHMENT F**

Four-Year Testimony History Federal Rules of Civil Procedure 26(a)(2)(B)(v)

None to Report in this Timeline

**ATTACHMENT G**

Compensation for Study and Testimony in the Case Federal Rules of Civil Procedure 26(a)(2)(B)(vi)

**Consulting Fee Schedule and Expertise**

**Case Review & Report:**

 $250 @ hour

**Deposition:**

$50 an hour travel time

$350 an hour -arrival to completion of deposition meeting

**Court testimony:**

$350 an hour

$1500 a day for 5-8 hours

Government rate per diem;

Provide flight, rental car and hotel if necessary.